# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

T.K., a minor child, by Next Friend
SARA GAGNON, and
SARA GAGNON,

                Plaintiffs,

v.

WAYNE CLEVELAND,
KEVIN MORSE,
JOSEPH WOODS,
TONY WHEATLEY, and
MONITEAU COUNTY, MISSOURI,

                Defendants.

Case No. 2:19-cv-04100-NKL

## ORDER

Before the Court is the Motion for Summary Judgment by Defendants Wayne Cleveland, Kevin Morse, Joseph Woods, Tony Wheatley, and Moniteau County, Missouri. Doc. 39. For the reasons stated below, Defendants' motion is granted in part and denied in part: The motion is denied on Counts II and III as to Defendants Cleveland, Morse, Woods, and Wheatley in their personal capacities and is otherwise granted.

## I.    BACKGROUND

This case arose out of incidents on August 7, 2017 and on July 24, 2018 involving Plaintiffs Sarah Gagnon and her minor son T.K. and Defendants Moniteau County Sheriff Tony Wheatley, and Moniteau County Deputies Wayne Cleveland, Kevin Morse, and Joseph Woods. Plaintiffs subsequently filed this lawsuit alleging that these officers and Moniteau County violated their constitutional rights and committed certain state law tort offenses during these incidents. The

1

individual officers are all sued in their individual and official capacities.  Specifically, Plaintiffs'

Complaint alleges the following causes of action:

- **Count I:** Unlawful Seizure pursuant to 42 U.S.C. § 1983 by Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018
- **Count II**: Excessive Use of Force pursuant to 42 U.S.C. § 1983 by Plaintiff Gagnon against Defendant Cleveland for the events of July 24, 2018
- **Count III**: Unlawful Search and Seizure pursuant to 42 U.S.C. § 1983 by Plaintiff Gagnon against Defendants Wheatley, Cleveland, Morse, and Woods, for the events of August 7, 2017
- **Count IV**: Failure to Train or Supervise pursuant to 42 U.S.C. § 1983 by Plaintiff Gagnon and Plaintiff T.K. against Defendants Wheatley and Moniteau County
- **Count V**: Battery pursuant to Missouri common law by Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018
- **Count VI**: False Imprisonment pursuant to Missouri common law by Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018
- **Count VII:** Infliction of Emotional Distress pursuant to Missouri common law by Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018
- **Count VIII**: Libel pursuant to Missouri common law by Plaintiff Gagnon against Defendant Wheatley for the events of August 7, 2017
- **Count IX:** Malicious Prosecution pursuant to Missouri common law by Plaintiff Gagnon against Defendants Wheatley, Cleveland, Morse, and Woods for the events of August 7, 2017

All Defendants now seek summary judgment as to each count against them.

## II.  FACTS[1]

### a.  **August 7, 2017 incident and subsequent events**

On August 7, 2017, Ms. Gagnon was a resident of 308 State Street in Clarksburg, Missouri.

Doc. 44-2, p. 18.  She had lived there since 2014 with her three children as well as her boyfriend

David Fields and his son.  *Id*. at 78–79.

---

[1] All facts are viewed in the light most favorable to the nonmoving party.  *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971 (8th Cir. 2019).

Mr. Fields "had a mortgage that was foreclosed on" the property. Doc. 44, p. 3, ¶ 13; Doc. 44-2, pp. 7, 19. Although the house was not in her name, Ms. Gagnon knew that they were behind on payments and made calls to the bank in an attempt to convince them to make some sort of deal.[2] Doc. 44-2, p. 19. In May 2017, Ms. Gagnon paid the bank $3,000, which was supposed to buy her time to try to procure a loan from another bank, because the original bank would no longer accept payments but was requiring her or Mr. Fields to purchase the home outright. *Id.* at pp. 20, 23; Doc. 44, p. 3, ¶ 14–15. Although she was never served with anything saying that her family needed to leave the home or an eviction notice, nor was she aware of any related filing with a court, ultimately she determined that they would be unable to afford the home and she and her family decided to pack their belongings and leave. Doc. 44-2, pp. 19–21.

On August 7, 2017, Ms. Gagnon was packing up her home with the help of two friends. Doc. 44-2, p. 26. At around 1:00 PM while moving furniture in the kitchen, Ms. Gagnon spotted through the window Moniteau County officers arriving. *Id.* at 28. Defendants claim that they were at the residence because "Defendant Wheatley received a call from the People's Bank of Jamestown on August 7, 2017, indicating that the bank had possession of a property located at 308 State Street in Clarksburg, MO, and that there were individuals inside the property." Doc. 41-1, A-000002.

---

[2] In her deposition, Ms. Gagnon made certain statements regarding the status of the foreclosure, and when asked "how do you know what the status of the foreclosure was if it was David Fields[']?" to which she responded "[b]ecause just from what David would tell me . . . and then also what David Snider told me." Doc. 44-2. Defendants contend the statements regarding the status of the foreclosure are thus premised on inadmissible hearsay. "When ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial. Thus, without a showing of admissibility, a party may not rely on hearsay evidence to support or oppose the motion." *Walker v. Wayne Cty.*, 850 F.2d 433, 434 (8th Cir. 1988). Therefore, for the purposes of summary judgment, the Court will only consider Ms. Gagnon's statements regarding the foreclosure that the testimony reflects were drawn from her own experience or offered as undisputed facts by Defendants.

On prior general advice of counsel, Ms. Gagnon decided to preemptively lock the front door and instruct the officers to go get a warrant. *Id*. However, before she reached the front door, the officers had already begun opening the door. *Id*. Ms. Gagnon's three dogs began growling and jumping at the door, and the officers quickly shut the door. *Id*. at pp. 29–30. Ms. Gagnon then locked the door to prevent the officers from entering. *Id*. at p. 31. Through the window in the door Ms. Gagnon could see that the officers had their guns drawn, and they told Ms. Gagnon to get her dog under control or else they would shoot him. *Id*. pp. 29–30. She told the officers not to shoot her dog, to which Deputy Cleveland responded that she needed to open the door, so she grabbed her dog, unlocked the door, and stepped away. *Id*. She again asked the officers not to shoot her dog, and Deputy Cleveland responded, "[d]o what I say then." *Id*. Deputy Cleveland then entered the home and walked past Ms. Gagnon and into the kitchen, while Sheriff Wheatley and Deputy Morris proceeded upstairs. *Id*. Ms. Gagnon asked them for a warrant, and they responded that they did not need a warrant, that they had a job to do, and that they were there to serve an eviction, and they left her alone in the living room. *Id*.; *Id*. at p. 80. In describing this event in his police report, Deputy Cleveland stated that "[c]ontact was made with Sarah Gagnon a former resident of the property and advised why we were there. Consent was asked to search the residence and it was granted." Doc. 44-5. Ms. Gagnon disputes this and states that she never gave consent. Doc. 44-2, p. 42.

The officers proceeded to search throughout the home. *Id*. at p. 33. They began asking Ms. Gagnon about methamphetamine, saying "[i]t's either on its way or it's hidden. Which one is it, Sarah?" *Id*. Ms. Gagnon responded that she did not know what they were talking about. *Id*. After the officers had searched the upstairs three different times, Officer Woods went upstairs and said he found a methamphetamine pipe, which he said had to be Ms. Gagnon's but would not show

4

it to her. *Id.* While Ms. Gagnon remained in the living room, Officer Wheatley then searched Ms. Gagnon's purse out of her sight near the back door and found a marijuana pipe. *Id.* at pp. 33–34. Ms. Gagnon had come across the pipe when she was cleaning out the closet of the spare bedroom that Mr. Fields' son had lived in and had thrown it in her purse. *Id.* at p. 34. Although she contends the pipe was clean when she found it, *id.*, Sheriff Wheatley asserted it contained marijuana. Doc. 41-1, A-000003.

Shortly thereafter, the officers called Ms. Gagnon into the kitchen, where they wrote her a ticket for possession of marijuana and subsequently transported her to jail where she was held for twenty-four hours. Doc. 44-2, p. 34; Doc. 44-5. A Moniteau County Sheriff's Office Press Release stated that during this incident, they located methamphetamine, marijuana, and drug paraphernalia, and that they had charged Ms. Gagnon with possession of methamphetamine and possession of drug paraphernalia. Doc. 41-1, A-000033. Deputy Cleveland's police report only mentions finding "a multi colored pipe with burnt marijuana inside" and that "Gagnon was issued a citation for the possession of marijuana." Doc. 44-5.

According to the Moniteau County Circuit Court Docket, on August 7, 2017 Ms. Gagnon was charged with possession of marijuana. Doc. 44-8. After a series of hearings over the course of ten months, Ms. Gagnon filed a motion to suppress the evidence obtained from her home on the grounds that the search of her home was conducted without a warrant, consent, or exigent circumstances. Doc. 44-9. On the day of trial, August 21, 2018, Moniteau County first produced to Ms. Gagnon and her attorney the only document in discovery—Deputy Cleveland's police report. Doc. 44-2, pp. 75–76. After Ms. Gagnon and her attorney reviewed the document, they spoke to the prosecutor and informed him that she would never provide her consent to a search as

5

stated in the report. *Id.* at pp. 77–78. The prosecutor then spoke to Deputy Cleveland privately and subsequently dismissed the charges. *Id.*

### b. July 24, 2018 Incident

Plaintiff T.K. is the minor son of Ms. Gagnon. *Id.* at pp. 7–8. On July 24, 2018, eleven-year-old T.K. left his home riding a motorized moped. Doc. 44-2, p. 11. T.K. says he was riding alongside Highway H, several feet away in the grass, when just down the road from his home Deputy Cleveland pulled up next to him. *Id.* at pp. 13–14. Deputy Cleveland claims that he was on patrol when he observed a young male operating a motorized scooter on Highway H. Doc. 41-1, A-000008. Deputy Cleveland then stopped the moped and asked T.K. what his name was, where he was coming from and going to, and who his parents were. Doc. 44-4, p. 15. T.K. stated that at this point Deputy Cleveland began getting angry and when T.K. asked Deputy Cleveland what he had done wrong, Deputy Cleveland responded "[y]ou want to go to jail? You want to get put in handcuffs?" *Id.* at p. 16. When T.K. responded that he did not, Deputy Cleveland then took T.K. by the arm, led him to the patrol vehicle, and put him in the front passenger seat. *Id.* He then used T.K.'s cell phone to call Ms. Gagnon and instructed her to come down the road to the vehicle. *Id.* at p. 18.

As Ms. Gagnon approached, Deputy Cleveland lit a cigarette and then exited the vehicle. Doc. 44-2, p. 53. When she arrived, Ms. Gagnon asked Deputy Cleveland to let T.K. out of the vehicle and questioned him about whether he was smoking in the vehicle with T.K., who had asthma. Doc. 44-2, pp. 53–57. Deputy Cleveland responded that Ms. Gagnon could not tell him what to do and that he was going to write her a ticket for allowing her son to ride the moped. *Id.* He then told her to sit in the grass. *Id.* She did not follow this order but rather responded that she wanted her son to come sit with her, because he was a minor and should have a parent with him.

6

*Id*. Deputy Cleveland then told Ms. Gagnon to shut her mouth and that she was being detained. *Id*. at p. 54. He pulled her left arm behind her back up to the top of her head and put a handcuff on it, and then he picked her up by the handcuffs and used his legs to sweep her legs out from under her and push her down onto the concrete. *Id*. He then pulled her right arm behind her and put the other handcuff on her right arm. *Id*. Ms. Gagnon weighs 101 pounds and is about five feet, two inches tall. *Id*. at p. 80. She estimates that Deputy Cleveland is over six feet tall and weighs around 260 or 280 pounds. *Id*. at 81. Another Moniteau County deputy was also there on the scene and witnessed the events. Doc. 41-1, A-000009.

After Ms. Gagnon was handcuffed, Deputy Cleveland asked her the proper spelling of her name. Doc. 44-2, p. 54. Ms. Gagnon responded, "Cleveland, you know the proper spelling of my name, G-A-G-N-O-N," to which he responded, "[t]hat's it. You're under arrest." *Id*. at p. 58. Deputy Cleveland then put Ms. Gagnon in the other deputy's vehicle. *Id*. Ms. Gagnon was left in the car for forty-five minutes while the officers searched the moped and asked her where her boyfriend, Mr. Fields was. *Id*. at pp. 58–59. Eventually, when another officer over the radio stated that they had Mr. Fields in custody, the officers let Ms. Gagnon out and told her and T.K. that they were free to go. *Id*. at p. 59. Deputy Cleveland neither wrote a police report on this incident nor issued Ms. Gagnon or T.K. a ticket as a result of this encounter.

Ms. Gagnon suffered a wrist injury, and that evening she went to the emergency room. *Id*. at p. 61. They x-rayed her wrist and diagnosed her with a deep contusion and a sprain. *Id*.; Doc. 44-6. They put her in a wrist splint, gave her pain medication, and instructed her to follow up with her physician if the injury worsened. Doc. 44-2, p. 61. Because Ms. Gagnon did not have any insurance and could not afford to go see a doctor, she did not seek a follow-up appointment. *Id*. at pp. 61–62. Her wrist has since healed. *Id*. at p. 62.

7

As a result of this encounter, T.K. attended between ten and fifteen therapy sessions, with appointments once every one or two weeks. Doc. 44-4, pp. 21–22. He also had difficulty sleeping, *id.*, and a doctor told Ms. Gagnon that she could give him melatonin, but she declined due to concerns about overmedicating him. Doc. 44-2, pp. 65–66. T.K. did not see a doctor specifically about sleeping difficulties. *Id.*

### c. Moniteau County Training

Sheriff Wheatley, on behalf of Moniteau County Sheriff's Office, issues a code of conduct for the Sheriff's Office titled "General Order #3: Conduct." Doc. 41-1, A-058–A-066. The policy does not mention procedure for conducting lawful searches and seizures. *Id.* The policy contains the section "3.3.7 Unauthorized Use of Force," which states "Do not use excessive or needless force against any person and stop use of force when it is no longer warranted." Doc. 41-1, A-062. This was Moniteau County Sherriff's Office's only written policy governing the conduct of Defendants Cleveland, Morse, and Woods on both August 7, 2017 and July 24, 2018. Doc. 47-1, A-73. Sheriff Wheatley makes the policy available in paper form when a new deputy is hired, and it is the deputies' responsibility to review and familiarize themselves with all policies and procedures. Doc. 41-1, A-056.

Deputy Cleveland has never previously been the subject of an investigation, had a formal complaint filed against him by an employer, or been named as a defendant in a lawsuit. Doc. 41-1, A-057. Sheriff Wheatley has obtained his Class A law enforcement license and attended more than 125 related courses, including multiple trainings in search warrants. Doc. 47-1, pp. A-67–A-81. Deputy Cleveland has also obtained his Class A law enforcement license and attended over forty law enforcement classes, including trainings in probable cause and reasonable suspicion, search warrants, and basic entry and search techniques. *Id.* Deputy Morse has earned his Missouri

Class A POST License, which has included 640 hours in coursework as well as continuing education hours. *Id*. Defendant Woods has served as an officer in other police departments and Sheriff's Offices, as well as on the Mid-Missouri Drug Task Force over the last ten years and has also received training in law enforcement topics in the last five years. *Id*.

## III.    LEGAL STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R. Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.    DISCUSSION

### a.    Official Capacity Claims

In Counts I–III and V–IX, Plaintiffs do not name Moniteau County directly but rather name Defendants Wheatley, Cleveland, Morse, and Woods in both their individual and official capacities. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) ("A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity.") A municipality may be held liable for a constitutional violation

9

under Section 1983 "if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom'; or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, MO.*, 829 F.3d 695, 699 (8th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

As to Counts I, II, and III made pursuant to 42 U.S.C. § 1983, Defendants argue that Moniteau County cannot be held liable under a *respondeat superior* theory, and that Plaintiffs have failed to allege an official municipal policy, an unofficial custom, or deliberately indifferent failure to train or supervise. Doc. 41, p. 12, Doc. 4 pp. 13–14 (citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978)). Plaintiffs respond that they have not alleged *respondeat superior* liability, but that rather because an official-capacity suit against an employee operates as a direct suit against a municipality, "[i]f the municipality gets notice that its employee is being sued in his official capacity but doesn't contest that fact, then any such suit can also proceed and culminate in a judgment against the municipality because it is a suit against a government entity in all respects other than name." Doc. 44, p. 12. Plaintiffs claim that because Moniteau County "has not contested the fact that Plaintiffs sued the individual defendants in their official capacities" and did not plead "a relevant affirmative defense" or "argue the matter in their supporting suggestions," "Moniteau County can be found directly liable under those counts because those counts are against it as a matter of law in all respects other than name." *Id.* (citing *Banks v. Slay*, 875 F.3d 876 (8th Cir. 2017) and *Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).

However, Plaintiffs arguments seem to misconstrue the law regarding pleading official-capacity suits with the law for succeeding on an official-capacity claim on the merits. Plaintiffs

10

are correct that "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. at 166. Thus the Court treats the official-capacity claims against Wheatley, Cleveland, Morse, and Woods as claims against Moniteau County. However, Plaintiffs must still plead and demonstrate a basis for holding the County liable; it is not enough to merely plead an official-capacity claim, nor is it an affirmative defense that can be waived by failing to raise in an Answer. As the Supreme Court has explained,

> on the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation, thus, in an official-capacity suit the entity's policy or custom must have played a part in the violation of federal law.

*Id.* (internal quotations and citations omitted) (emphasis in original). *See also Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361–62, 116 L. Ed. 2d 301 (1991) ("Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law." (internal quotations omitted)). Plaintiffs' argument that Defendants failed to plead "a relevant affirmative defense" is immaterial because Defendants do assert in their Suggestions in Opposition that Plaintiffs have failed to demonstrate a policy or custom that was a moving force behind the actions in Counts I, II, or III. Plaintiffs cite to *Banks v. Slay*, 875 F.3d 876 (8th Cir. 2017), but there the Eighth Circuit only reaffirmed the holding of *Kentucky v. Graham* that "an official-capacity suit is a suit against a government entity in all respects other than name." *Banks*, 875 F.3d at 881. It did not find that by naming an individual in their official capacity, a plaintiff can avoid the requirement of demonstrating that a municipal policy or custom played a part in the violation of federal law. Plaintiffs fail to provide support for any theory of liability against Moniteau County in their

11

Complaint or Suggestions in Opposition under Counts I, II, or III.[3] Therefore Defendants' Motion for Summary Judgement as to the official-capacity claims in Counts I–III is granted.[4]

As to Counts V–IX made pursuant to Missouri law, Defendants argue that these claims against Defendants in their official capacities are barred by sovereign immunity. Plaintiffs "concede that Moniteau County should not be liable under Counts V-IX." Doc. 44, p. 15. Therefore, Defendants' Motion for Summary Judgment on Counts V, VI, VII, VIII, and IX against the Defendants in their official capacities is granted.

For the reasons stated above, Defendants' Motion for Summary Judgment on the official-capacity claims against all Defendants on Counts I–III and V–IX is granted.

### b. § 1983 Claims

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert claims for unlawful seizure, excessive force, and unlawful search against the officers, as well as a claim for failure to train or supervise against Defendant Wheatley and Moniteau County. In addition to other arguments, the officers each assert the defense of qualified immunity to the claims against them in their personal capacities.

---

[3] As Defendants point out in their Suggestions in Support, Plaintiffs did plead that "the acts and omissions of Defendant Wheatley complained of herein represent those of an official policy or governmental custom of Defendant Moniteau County." Doc. 1, ¶ 10. Counts I and II do not name Defendant Wheatley, but Count III does. While "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*," *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985), "an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). On this theory, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). However, Plaintiffs do not appear to argue this as a basis for Moniteau County's liability in their Suggestions in Opposition, and they have not explicitly pointed to facts or cited law from which the Court could draw this conclusion. Therefore the Court does not consider it.

[4] Although it is unclear from Plaintiffs' briefing whether they intended their failure to train claim in Count IV to serve as the basis for official liability in Counts I, II, and III, *see* Doc. 44, pp. 12–13, to the extent that they do, these arguments are addressed below in Count IV.

12

"Qualified immunity shields government officials from [personal] liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). "Evaluating a claim of qualified immunity requires a two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Winslow v. Smith*, 696 F.3d 716, 730–31 (8th Cir. 2012) (internal quotations omitted). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

"The 'clearly established' standard . . . requires that the legal principle . . . be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Dist. of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018) (citations omitted). In determining whether a legal right is clearly established, the Eighth Circuit "applies a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles." *Whisman through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

"The party asserting the defense of qualified immunity has the burden of establishing the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *McGuire v. Cooper*, 952 F.3d 918, 922 (8th Cir. 2020) (internal quotations omitted).

### i. COUNT I: Unlawful Seizure – Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018

In Count I, Plaintiffs allege that during the July 24, 2018 incident, Deputy Cleveland unlawfully seized Plaintiffs in violation of their Fourth Amendment rights when he stopped T.K.

13

on his moped and placed him in the police vehicle and detained and arrested Ms. Gagnon. Doc. 1, pp. 6–7. "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (quoting *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003)).

Defendant Cleveland moves for summary judgment on the basis of qualified immunity. Defendants do not argue that Plaintiffs were not seized but rather assert that a reasonable officer in Deputy Cleveland's position would have detained both T.K. and Ms. Gagnon.

As to T.K., "[a] traffic stop is a seizure subject to the Fourth and Fourteenth Amendments' protections against unreasonable searches and seizures." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014). "'Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred.'" *Id.* (quoting *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)). "If there is an 'articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered,' a traffic stop on that basis is not unreasonable under the Fourth Amendment." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Whether such a seizure is reasonable "must be determined on the totality of the circumstances and is to be judged from the perspective of a reasonable officer on the scene without regard to the underlying intent or motivation." *Andrews v. Fuoss*, 417 F.3d 813, 817 (8th Cir. 2005) (quoting *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999)).

Defendants argue that because Missouri law requires vehicle operators to be licensed, "a reasonable law enforcement officer in Deputy Cleveland's position could have observed a young individual like T.K. operating a motorized vehicle and stopped him for doing so." Doc. 41, p. 16.

*See* Mo. Rev. Stat. § 307.195(1) ("No person shall operate a motorized bicycle on any highway or street in this state unless the person has a valid license to operate a motor vehicle.") Plaintiffs respond that T.K. was not operating *on* Highway H but rather was riding several feet away from the road in the grass. *See* Mo. Rev. Stat. § 300.010(36) (defining "street" or "highway" as "the entire width between the lines of every way publicly maintained when any part thereof is open to the uses of the public for purposes of vehicular travel.") Therefore, Plaintiffs contend a dispute of fact remains as to whether Cleveland had a basis to stop T.K.

However, even accepting as true that T.K. was riding the moped in the grass next to the road rather than on the road, a reasonable officer seeing a young male riding alongside the highway on a motorized moped could have suspected a traffic violation. The record reflects that on July 24, 2018, T.K. was eleven years old, and under Missouri law, a license may not be issued to any individual under sixteen years old. *See* Mo. Rev. Stat. § 302.060. When Deputy Cleveland approached T.K., he asked who his parents were and subsequently asked him to call his mother, which supports the inference that T.K. appeared to be a young child. Even if he was riding next to the highway rather than in the highway, this is sufficiently suspicious behavior that a reasonable officer could have believed T.K. had operated the moped illegally to get to where he was or was about to operate the moped illegally. *See United States v. Chavez Loya*, 528 F.3d 546, 553 (8th Cir. 2008) (quoting *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007)) ("While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop."); *Thomas v. Dickel*, 213 F.3d 1023, 1025 (8th Cir. 2000) (finding that the "absence of visible shoulder harness pulled down and across a driver" provided police with reasonable suspicion that the plaintiffs were violating the law requiring seatbelts to be worn, even though some seatbelts do not include a shoulder

15

harness). Thus, a reasonable officer would have had an articulable and reasonable suspicion that the young male was operating the moped illegally and Deputy Cleveland's decision to initiate the stop did not violate the Fourth Amendment.

As to Ms. Gagnon, Deputy Cleveland first told her she was being detained and then subsequently told her she was being arrested. "A warrantless arrest is reasonable under the Fourth Amendment where it is supported by probable cause," and "[p]robable cause exists when the facts and circumstances within an officer's knowledge are sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Bernini v. City of St. Paul*, 665 F.3d 997, 1003 (8th Cir. 2012). Defendants argue that under Missouri law, an individual commits the crime of "interfering with a stop if, knowing that a law enforcement officer is attempting to stop an individual or vehicle, for the purpose of preventing the officer from effecting the stop, the person interferes with the stop by using, or threatening the use of physical interference." Doc. 41, p. 16 (citing Mo. Rev. Stat. § 575.150). Thus, "a reasonable officer in the position of Deputy Cleveland could have believed that Gagnon was interfering with the stop when she did not comply with Deputy Cleveland's instruction to sit by the side of the car." *Id*. Plaintiffs respond that "[s]ince Defendant Cleveland did not have any lawful reason to stop Plaintiff T.K., then it follows that Plaintiff Gagnon could not have interfered with a 'traffic stop' because he did not conduct one." Doc. 44, p. 17. However, the Court has found that Deputy Cleveland's stop of T.K. did not violate the Fourth Amendment. Given that Ms. Gagnon admits that she failed to comply with Deputy Cleveland's order to go sit in the grass, as well as her requests that Deputy Cleveland let T.K. out of the car, Deputy Cleveland's belief that Ms. Gagnon was attempting to interfere with the stop was objectively reasonable under the circumstances. Absent any other argument from Plaintiffs regarding why Deputy Cleveland did not have reasonable suspicion to

16

detain or probable cause to arrest Ms. Gagnon for this offense, Deputy Cleveland's actions were reasonable and did not constitute an unlawful seizure. Therefore, he is entitled to qualified immunity and his motion for summary judgment on Count I is granted.

ii. **COUNT II: Excessive Use of Force – Plaintiff Gagnon against Deputy Cleveland for the events of July 24, 2018**

An excessive force claim is "evaluated under the reasonableness standard of the Fourth Amendment." *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quoting *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011)). "[A]n officer's use of force is not excessive under the Fourth Amendment if it was 'objectively reasonable under the particular circumstances.'" *Andrews*, 417 F.3d at 818 (quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994)). In determining whether force was excessive, the Court "balances the individual's Fourth Amendment interest against the countervailing governmental interests at stake," taking into consideration "the severity of the crime; whether the suspect poses a threat of harm to others; whether the suspect is resisting arrest; and other factors, such as whether the situation is tense, uncertain, and rapidly evolving, which would force an officer to make split-second judgments about how much force is necessary." *Coker v. Arkansas State Police*, 734 F.3d 838, 842–43 (8th Cir. 2013) (internal citations and quotations omitted). "[W]hile not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment, we have repeatedly acknowledged force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012) (internal citations and quotations omitted).

Deputy Cleveland's argument on summary judgment is that Ms. Gagnon's injury was *de minimis*, which does not support a claim for excessive force, and that he is entitled to qualified

17

immunity. However, in 2011 the Eighth Circuit reviewed its precedent which suggested that a *de minimis* injury necessarily forecloses a claim of excessive force under the Fourth Amendment and found that this was not the appropriate question. *See Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) ("As a general proposition . . . there is no uniform requirement that a plaintiff show more than *de minimis* injury to establish an application of excessive force.") Rather, "[t]he appropriate inquiry is 'whether *the force used* to effect a particular seizure is reasonable.'" *Id*. at 906 (quoting *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (emphasis in *Chambers*). Thus, it is a *de minimis* use of force, rather than a *de minimis* injury, that is categorically insufficient to support an excessive force claim. *Id*. While a showing of only *de minimis* injury may be relevant insofar as it illustrates the amount of force used, "it is logically possible to prove an excessive use of *force* that caused only a minor *injury*, and a rule that forecloses a constitutional claim in that circumstance focuses on the wrong question." *Id*. (emphasis in original).

Thus the extent of Ms. Gagnon's wrist contusion and sprain is only one factor in the totality of circumstances that the Court must consider when determining whether Deputy Cleveland's use of force was objectively reasonable under these particular circumstances. Deputy Cleveland's summation of the incident states that "Sarah Gagnon approached Defendant Cleveland's vehicle during this traffic stop and did not comply with orders. Gagnon was detained for interfering and would not comply," and when asked what actions Ms. Gagnon took that he believed threatened his safety, he responded in an interrogatory, "Sarah Gagnon would not comply." Doc. 41-1, A-000008. However, when viewing all facts and drawing all reasonable inferences in the light most favorable to Ms. Gagnon, Ms. Gagnon approached the vehicle when called to do so by Deputy Cleveland. Although she did not follow Deputy Cleveland's request when asked to sit in the grass,

she responded by asking that her son be allowed to sit with her so that he could exit the smoky patrol vehicle. Ms. Gagnon is five feet two inches tall and weighs just over 100 pounds, and she estimates that Deputy Cleveland is about six feet one or two inches tall, weighing between 260 and 280 pounds. Beyond failing to follow Defendant Cleveland's order to sit in the grass, there is no evidence that she was fleeing or resisting the detainment, that the situation was tense or uncertain, or that Deputy Cleveland was forced to make a quick judgment about how much force is necessary. Although Deputy Cleveland reasonably suspected Ms. Gagnon was attempting to interfere with the stop, there is no evidence that she was doing so aggressively or violently or that she had made any movements toward him that could appear threatening. Further, there was another officer at the scene, and the only other individual present was Ms. Gagnon's eleven-year-old son who was in Deputy Cleveland's vehicle. Defendants do not contend, and there is no evidence to suggest, that anything about the scene beside the road itself was escalating or tense; rather, after the incident the deputies remained beside the road for another forty-five minutes while they searched the moped. They then released Ms. Gagnon and T.K. without issuing any tickets or further warnings, and Deputy Cleveland never wrote a report about the incident. The totality of circumstances viewed in a light most favorable to Ms. Gagnon show that Deputy Cleveland was confronted with a small woman who had been called to the scene of her child's traffic stop and was upset that the child was being detained in a vehicle containing smoke that could aggravate his asthma, and in response to being asked to sit by the side of the road, she asked if her son could sit with her so he could have a parent with him; the Court cannot say that as a matter of law, Deputy Cleveland's decision to twist her arms behind her back and up toward her head, pick her by the handcuffs and use his leg to sweep her legs out from under her, slam her into the concrete, and tightly place handcuffs on her, all resulting in a deep contusion to her wrist and a sprain, was

objectively reasonable.  *See Rokusek v. Jansen*, 899 F.3d 544, 547 (8th Cir. 2018) (officer's use of force not objectively reasonable under the circumstances where although plaintiff disobeyed the officer's three orders to stand up and slightly pushed back while in the officer's hold, the plaintiff was an "unarmed, nonviolent offender" who was not threatening to the officer, was not actively resisting or fleeing, and "[n]onetheless, the much larger [officer] lifted him off the ground and slammed his head into the floor, causing him to lose two teeth.")

The law cited by Defendants to support their argument that the injury here was *de minimis*, barring Ms. Gagnon's claim, does not compel a different result.  In *Davis v. White*, 794 F.3d 1008, 1012 (8th Cir. 2015), the Eighth Circuit reviewed a district court's determination that a concussion, a scalp laceration, and bruising could be considered *de minimis* as a matter of law for qualified immunity purposes and concluded that the district court erred in granting summary judgment on this ground, citing a string of Eighth Circuit cases coming to different conclusions where relatively minor injuries were at issue.  The Eighth Circuit remanded the case for further proceedings under the objective reasonableness standard.  *Davis*, 794 F.3d at 1012.  In *Bishop v. Glazier*, the Eighth Circuit reviewed a use of force that occurred prior to *Chambers*, and thus found that where the only injury suffered was a light cut that did not bleed or require any treatment,  "[a]s of December 2010, when Glazier encountered Bishop, 'a reasonable officer could have believed that as long as he did not cause more than *de minimis* injury to an arrestee, his actions would not run afoul of the Fourth Amendment.'"  *Bishop v. Glazier*, 723 F.3d 957, 962 (8th Cir. 2013) (quoting *Chambers*, 641 F.3d at 908).  However, since *Chambers*, "it is now clearly established that an officer is not entitled to qualified immunity if his use of force is excessive in the circumstances, even if the injury inflicted was minor."  *LaCross v. City of Duluth*, 713 F.3d 1155, 1159 (8th Cir. 2013).  Further, the injury in *Bishop*— "a 'light cut' on his neck that did not bleed and for which he did

not seek any treatment"—is less substantial than the deep wrist contusion and sprain here, requiring a visit to the emergency room, an x-ray, a splint, and pain medication.

In *Wertish v. Krueger*, which Defendants say is "particularly on point," the plaintiff had driven erratically and dangerously for miles on the public highway, ignoring the officers' flashing lights and sirens, and when the plaintiff eventually pulled over, he failed to comply with orders to get out of his vehicle, he laid on his hands upon being pulled out of the truck such that they could not be handcuffed, and he would not stand up requiring him to be pushed up against the truck. *Wertish v. Krueger*, 433 F.3d 1062, 1066–67 (8th Cir. 2006). The Eighth Circuit determined that the totality of circumstances made it objectively reasonable for the officers to believe "they were dealing with a belligerent drunk—or perhaps a fleeing criminal—who required forcible detention. The force employed was appropriate to the task at hand." *Id.* The Eighth Circuit also found that the "relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition" resulting from the arrest and attempts to handcuff the plaintiff were *de minimis* injures that supported the conclusion that the officer did not use excessive force. *Id.* Here, even if the Court accepted Defendants' arguments that Ms. Gagnon's injuries were on par with the *Wertish* plaintiff's scrapes, bruises, and aggravation of shoulder condition, the Eighth Circuit's analysis is clear that there "[t]he force employed was appropriate to the task at hand" in light of the totality of circumstances; the task at hand here was to detain Ms. Gagnon in a circumstance that was significantly less threatening and uncertain with a suspect who was not actively resisting and did not pose a threat to public safety, but rather had been called to the scene by Deputy Cleveland. Similarly in *Andrews v. Fuoss*, the Eighth Circuit found the plaintiff's "at most very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions" in conjunction with "the rapidly developing nature of the incident," where the plaintiff

21

was attempting to walk toward her son during his sentencing hearing in the courtroom, indicated that the officer's "forceful blow" to the plaintiff's shoulder was a reasonable amount of force. *Andrews*, 417 F.3d at 818 (8th Cir. 2005). Here, viewing all facts in Ms. Gagnon's favor, there was no rapidly developing nature of the situation or a mere previous condition that was only aggravated. Thus, Defendants' cited caselaw does not require a different outcome.

In sum, Ms. Gagnon's injury here is not the only factor the Court considers, and in the totality of circumstances, when viewing all facts and drawing all reasonable inference in Plaintiffs' favor, the Court cannot say that as a matter of law Deputy Cleveland's force was objectively reasonable; rather, genuine issues of material fact exist regarding whether the amount and degree of force used by Deputy Cleveland was excessive.

However, although a reasonable jury could find that Deputy Cleveland violated Ms. Gagnon's constitutional right, the Court must also address whether that right was clearly established. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks and citation omitted). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ." *Hope*, 536 U.S. at 739 (quotation marks and citation omitted).

Defendants do not argue that Ms. Gagnon's right to be free from excessive force under these circumstances was not a clearly established right, and the Court finds that it was.

In *Kukla v. Hulm*, 310 F.3d 1046 (8th Cir. 2002), a commercial truck driver pulled over at a truck inspection site, but refused to give his driver's license and logbook to a motor carrier inspector who approached the plaintiff but was not readily identifiable as an officer and refused to identify himself. *Kukla*, 310 F.3d at 1048. After a uniformed officer approached and made the same request, the plaintiff complied, but the original officer subsequently issued a ticket to the plaintiff for failing to produce the logbook, and the plaintiff refused to sign. *Id*. A second officer arrived and advised plaintiff to sign the ticket or be subject to arrest, and the plaintiff again refused. *Id*. After the plaintiff was "manhandled" during an arrest, a doctor subsequently determined that he had strained and sprained his right shoulder, distal right clavicle, right elbow, and right wrist. *Id*. Reviewing the totality of circumstances, the Eighth Circuit found that:

> Here, [the plaintiff] alleges that although he did not resist arrest or take an aggressive stance, [the officer] forced him against his truck, twisted his arm, and raised it high behind his back injuring his collar bone, shoulder, neck, and wrist. [The plaintiff] also claims the handcuffs were so tight that they broke his wrist and were not loosened for fifteen minutes despite his repeated complaints. Considering the circumstances, including the offense at issue, the lack of an immediate safety threat, and the lack of active resistance to arrest, we agree that there is a genuine issue of whether the force used was excessive, so the district court properly denied summary judgment to [the officer].

*Id*. Further, the Eighth Circuit determined that "[t]he right [to be free from excessive force] was also clearly established at the time of [the plaintiff's] arrest." *Id*.

In *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009), officers attempted to pull over a car on the highway, and the car initially did not stop. *Id*. The car eventually pulled over, and the driver exited the car and refused to get back in the car. *Id*. After the driver was handcuffed, the passenger called 911 on her cell phone. *Id*. The officers approached the vehicle, opened the passenger's side door, and twice ordered her to get off the phone, which she refused, saying that she was frightened. *Id*. The officer then applied a taser to her arm. *Id*. The officer

23

claimed that when he approached the vehicle, there were two glasses at plaintiff's feet, possibly containing alcohol, and that he thought she might be intoxicated. *Id*. The Eighth Circuit reviewed the totality of circumstances, finding:

> nothing in the record indicates that [plaintiff] was actively resisting arrest as she sat in the car or that she was attempting to evade arrest by flight. Her principal offense, it would appear, was to disobey the commands to terminate her call to the 911 operator. Whether [the officer] reasonably interpreted her refusal as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide.

*Id*. at 497. Thus, the Eighth Circuit held that "[i]n light of both the undisputed facts and [plaintiff's] version of the disputed facts in this case, we cannot say that [the officer's] use of force was reasonable as a matter of law, and we conclude that there is a genuine issue of material fact as to whether [the officer] used excessive force in violation of [plaintiff's] constitutional rights." *Id*. at 498. The Eighth Circuit further held that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public," *id*. at 499, and thus the law was sufficiently clear to inform a reasonable officer that the alleged conduct was unlawful.

In *Montoya v. City of Flandreau*, 669 F.3d 867 (8th Cir. 2012), the Eighth Circuit held that it could not say an officer's use of force was objectively reasonable as a matter of law where an officer responding to a domestic dispute viewed the plaintiff raise her hands above her head in frustration while standing ten to fifteen feet away and arguing with her ex-boyfriend. *Id*. at 871. The officer pulled one arm behind her back, performed a leg sweep, and then handcuffed the second arm, all of which resulted in a broken leg. *Id*. The Eighth Circuit found that when viewing all facts in a light most favorable to the plaintiff, "at the time [the officer] performed the 'leg sweep,' [plaintiff] was not threatening anyone, was not actively resisting arrest, and was not attempting to flee. At most, her actions amounted to a violation of a law restricting disorderly

24

conduct, a misdemeanor punishable by no more than thirty days' imprisonment, a fine of five hundred dollars, or both." *Id*. Thus, although the district court had concluded the leg sweep was objectively reasonable due to the ongoing and "rapidly evolving domestic dispute" that had resulted in the ex-boyfriend making two separate calls to the police, the Eighth Circuit found that based on the physical distance between the plaintiff and the officers, the nature of the crime at issue, and the injury suffered, the force was not objectively reasonable as a matter of law. *Id*. at 872. The Eighth Circuit further reversed the district court's grant of summary judgment on qualified immunity grounds, finding that "[a]ssuming once again [plaintiff's] story is true, the contours of the right at issue were sufficiently clear to inform a reasonable officer in [defendant's] position it was unlawful for him to perform a 'leg sweep' and throw to the ground a nonviolent, suspected misdemeanant who was not threatening anyone, was not actively resisting arrest, and was not attempting to flee." *Id*. at 873. The type of force Deputy Cleveland used here was remarkably similar, and although the *Montoya* plaintiff's resulting injury was more severe, the Eighth Circuit's *Chambers* decision explained that "[a] greater than *de minimis* injury requirement under the Fourth Amendment would mean that the same quantum of force, in the same circumstances, could be unconstitutional when applied to a citizen with a latent weakness and constitutional when applied to a hardier person. The governing rule should not turn on such unpredictable and fortuitous consequences of an officer's use of force." *Chambers*, 641 F.3d at 906. Thus, *Montoya* is on point. *See also Rokusek,* 899 F.3d at 548 ("[S]everal cases establish that every reasonable official would have understood that he could not throw [the plaintiff]—a nonviolent, nonthreatening misdemeanant who was not actively resisting—face-first to the ground"); *Shannon v. Koehler*, 616 F.3d 855, 864 (8th Cir. 2010) (holding that "[l]ong before September 13, 2006, this court (among others) had announced that the use of force against a

suspect who was not threatening and not resisting may be unlawful" and "[a]lthough [plaintiff] greeted [the officer] in a disrespectful, even churlish manner, that alone did not make [the officer's] use of force acceptable under extant law"); *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (officer not entitled to summary judgment on qualified immunity where, viewing the facts in plaintiff's favor, "[plaintiff] was charged with nonviolent misdemeanors. He did not pose an immediate threat to the safety of the officers or others. He was walking away from them, toward his trailer. He was not in flight or resisting arrest. [Defendant officer] had not advised him he was under arrest. It was unreasonable for [the officer] to use more than *de minimis* force against [plaintiff] by running and tackling him from behind without warning," causing three lacerations above his eye); *Wilson v. Lamp*, 901 F.3d 981, 990 (8th Cir. 2018) (officers' continued drawing and pointing weapons at plaintiff was excessive force; although "the officers argue[d] that the law is not clearly established, claiming that this court has not recognized excessive force under similar facts[, t]o the contrary, an officer's 'use of force against a suspect who was not threatening and not resisting' is unreasonable.")[5]

Therefore, taking Ms. Gagnon's version of the events as true and drawing all reasonable inferences in her favor, her right to be free from excessive force as a nonviolent, non-fleeing, individual who was not actively resisting, did not threaten the officer, was suspected of a minor crime, and only failed to sit the grass because she asked if her son could come and sit with her, all within a circumstance that was not remotely tense or rapidly evolving, was clearly established. Although distinctions between precedent and the circumstances of this case may indicate that the

---

[5] Although the Eighth Circuit's decision in *Wilson v. Lamp* was issued on August 28, 2018, more than one month after the incident at issue here, the Eighth Circuit's discussion of whether the law was clearly established in 2014—the time of the events in *Wilson*—is relevant for the Court's analysis here of whether Ms. Gagnon's right was clearly established in 2018.

"very action" in question has not previously been held unlawful, the Court finds that the "contours" of this right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739. Defendants have not argued otherwise. Therefore, Deputy Cleveland's motion for summary judgment on Count II is denied.

### i. COUNT III: Unlawful Search and Seizure – Plaintiff Gagnon against Defendants Wheatley, Cleveland, Morse, and Woods, for the events of August 7, 2017

In Count III of Plaintiffs' Complaint, they allege that Defendants Wheatley, Cleveland, Morse, and Woods forcibly and unlawfully entered and searched Ms. Gagnon's residence. Defendants contend that their entry and search was lawful and that they are entitled to qualified immunity.

Although in their Answer Defendants asserted that they "had a valid search warrant for the premises on August 7, 2017, and conducted all searches within the scope of all warrants," Doc. 19, ¶ 35, they subsequently admitted that there was no search warrant. Doc. 44-10, pp. 9–10. While the police report stated that the deputies spoke to Ms. Gagnon and that "[c]onsent was asked to search the residence and it was granted," Doc. 44-5, Defendants do not offer Ms. Gagnon's consent as grounds for their search in their briefing, and Ms. Gagnon has asserted that she did not provide consent, both in her Motion to Suppress material obtained during the search in her subsequently dismissed criminal prosecution, Doc. 44-9, as well as in her deposition during which she said that she does not open the door for law enforcement officers unless they have a warrant on advice of counsel, Doc. 44-2, p. 42.

Defendants' first argument on summary judgment is that Ms. Gagnon cannot assert a Fourth Amendment violation, because she had no reasonable expectation of privacy in the home. "[A] Fourth Amendment search occurs when the government violates a subjective expectation of

27

privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 2042, 150 L. Ed. 2d 94 (2001). "Under this test, a party asserting a violation of his or her reasonable expectation of privacy must show both: 1) an actual (subjective) expectation of privacy, and 2) that the expectation is one that society is prepared to recognize as reasonable." *Azam v. City of Columbia Heights*, 865 F.3d 980, 989 (8th Cir. 2017) (internal quotations omitted). "The first question is a question of fact, the second is a question of law." *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014). In making this assessment, "[t]here is no 'single metric or exhaustive list of considerations,' but a defendant's expectation of privacy must be grounded in property law or understandings that are recognized by society." *United States v. Bettis*, 946 F.3d 1024, 1027 (8th Cir. 2020) (quoting *Byrd v. United States*, 138 S. Ct. 1518, 1527, 200 L. Ed. 2d 805 (2018)). Factors that may be relevant include "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). However, "wrongful presence at the scene of a search would not enable a defendant to object to the legality of the search." *Byrd*, 138 S. Ct. at 1529 ("A burglar plying his trade in a summer cabin during the off season, for example, may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as legitimate." (internal quotations omitted)).

Defendants contend that Ms. Gagnon's presence was wrongful, because they suspected her to be a trespasser based on the call from the bank that someone was illegally living in the property. Doc. 41, pp. 17–19. But the details Defendants have provided regarding the call they received earlier on the same day of the search are sparse. Sheriff Wheatley stated he "received a call from

the People's Bank of Jamestown on August 7, 2017, indicating that the bank had possession of a property located at 308 State Street in Clarksburg, MO, and that there were individuals inside the property." Doc. 41-1, A-000002. Defendant Cleveland similarly stated that he "responded in reference to subjects on the property that had no legal right to be there," Doc. 41-1, A-00010, and Defendant Woods stated he "was notified by Sheriff Wheatley that he had received a call from a bank employee stating that someone was illegally living in a residence which had been repossessed by the bank. No one had permission from the bank to be inside the residence." Doc. 41-1, A-00015. However, Deputy Cleveland's police report indicates that they also knew that Ms. Gagnon was a resident of the home who had not vacated, as it says "Sheriff Wheatley advised that the property had been taken over by the bank and subjects were still on the property. Contact was made with Sarah Gagnon a former resident of the property and advised why we were there." Doc. 44-5. Ms. Gagnon states that when they entered the home and she asked them for a warrant, they told her that they did not need a warrant and were there to serve an eviction.

Under Missouri law, "[w]hen any person willfully and without force holds over any lands, tenements or other possessions . . . after a mortgage or deed of trust has been foreclosed and the person has received written notice of a foreclosure . . . such person is guilty of an 'unlawful detainer.'" Mo. Rev. Stat. § 534.030. A complainant may file a civil unlawful detainer action in order to remove the individual from the property, and the clerk of the court must "issue a summons directed to the sheriff or proper officer of the county, commanding him to summon the person against whom the complaint shall have been made to appear, at a day in such summons to be specified." Mo. Rev. Stat. § 534.070. If a defendant fails to appear, the court "entering a judgment for possession of the premises shall . . . send a notice to the party ordered to relinquish possession that a judgment for possession of the premises has been entered against said party, and said party

must vacate the premises when the judgment is final." Mo. Rev. Stat. § 534.345. The court entering the judgment of possession can also upon request of the prevailing party "order the sheriff or appropriate officer to deliver possession of the premises to the prevailing party within fifteen days of the date the judgment becomes final." Mo. Rev. Stat. § 534.355. *See also* Mo. Rev. Stat. § 441.060.5 (describing process by which a landlord may remove locks and enter and take a premises after the rendition of a judgment). An "officer having charge of a writ of restitution or rerestitution . . . shall have power to expel and remove from the premises mentioned and defendant therein named, his servants and others under his control, and all other persons who shall have entered thereon after the commencement of the suit otherwise than by process of law, and to deliver to the plaintiff possession thereof." Mo. Rev. Stat. § 534.590.

The Eighth Circuit caselaw on this issue, as well as caselaw from other jurisdictions, generally indicates that an individual loses his or her reasonable expectation of privacy when he or she has been justifiably ejected. *See United States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009) ("[W]hatever expectation of privacy Molsbarger may have had, it ceased when he was justifiably evicted from the hotel."); *Young v. Harrison*, 284 F.3d 863, 869 (8th Cir. 2002) ("When Young was justifiably evicted from the hotel because his friends created a disturbance, the control over the hotel room reverted to the management and Young cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled." (internal quotations omitted)); *United States v. Rambo*, 789 F.2d 1289, 1295 (8th Cir. 1986) (finding the Defendant "was justifiably ejected from the hotel under Minnesota law" and he could not "assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled"); *Woodward v. City of Tucson*, 870 F.3d 1154, 1160 (9th Cir. 2017) ("Because the undisputed evidence shows that Watts was

aware of her eviction, this case differs from situations where the individuals claiming privacy rights either did not know they had been evicted or claimed that they still had tenancy rights."); *United States v. Curlin*, 638 F.3d 562, 566 (7th Cir. 2011) (defendant had no reasonable expectation of privacy because he "had been evicted over two weeks earlier following an action in Indiana court, and had been given notice of his eviction when officers twice left copies of the eviction order at the residence," but "[h]ad [the defendant's] landlord not obtained an eviction order of which [the defendant] had notice, the analysis would be different.");  *United States v. Banks*, 262 F. App'x 900, 905 (10th Cir. 2008) ("We need not consider whether there were exigent circumstances, however, because Banks was evicted prior to the search and thus, he did not have a reasonable expectation of privacy in his room at the time of the search."); *Turpin v. Ray*, 319 F. Supp. 3d 191, 199 (D.D.C. 2018) (finding no reasonable expectation of privacy where, "even taking all of [plaintiff's] factual allegations as true, [he] was admittedly occupying the residence through forced entry, when he knew a Writ of Restitution was outstanding against him" but "[h]ad [plaintiff] not broken into the residence, or had a judgment not yet been entered regarding his eviction proceedings, this Court might have reached a different conclusion."); *United States v. Tealer*, No. 8:14CR185, 2016 WL 5816915, at *2 (D. Neb. Oct. 5, 2016) ("Tealer lacks standing to assert a Fourth Amendment violation as an overnight guest because any reasonable expectation of privacy he might have had was lost once the landlord regained legal possession of the Arias Apartment through the eviction proceedings."); *United States v. Jones*, No. 06-20343, 2011 WL 1770264, at *4 (W.D. Tenn. May 9, 2011) ("Before a tenant is lawfully evicted, the tenant is not a trespasser without a reasonable expectation of privacy in his residence . . . However, once a landlord has obtained a court order lawfully evicting a tenant from a residence, the tenant ceases to have an objectively reasonable expectation of privacy in that residence."); *United States v. King*,

693 F. Supp. 2d 1200, 1212 (D. Haw. 2010) (quoting *United States v. Cunag*, 386 F.3d 888 (9th Cir. 2004)) ("It is the 'affirmative act of repossession by the lessor' that 'obliterates any cognizable expectation of privacy a lessee might have'"); *Gerhart v. Com. of Pa.*, CIV.A. 09–CV–1145, 2009 WL 2581715, at *3 (E.D.Pa. Aug. 13, 2009) ("The acts of police officers in assisting an illegal eviction without an order, a writ, a warrant, or any other statutory authority can constitute an unreasonable seizure in violation of the Fourth Amendment"); *cf. U.S. v. Washington*, 573 F.3d 279, 284 (6th Cir. 2009) ("The landlord's mere authority to evict a person cannot of itself deprive that person of an objectively reasonable expectation of privacy. There are extensive legal procedures that a landlord must adhere to before occupants are lawfully dispossessed of property without their consent, and the landlord's failure to evict an occupant who is in technical violation of the lease effectively waives whatever authority the landlord has to treat a person as a trespasser."); *United States v. Young*, 573 F.3d 711, 720 (9th Cir. 2009) ("At the time of the search, Young's rental period had not elapsed, and the hotel staff had not evicted Young from his room. His privacy interest in the room therefore remained intact."); *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859 (7th Cir. 1999) ("[A]s the plaintiffs' landlord had not as of October 25 obtained a valid order granting him exclusive possession of the premises, the plaintiffs had standing to contest the search.").

Here, there is no evidence before the Court that, as required by law, the bank had successfully pursued an unlawful detainer action in civil court, had received a judgment against Ms. Gagnon's boyfriend Mr. Fields, and had been issued a Writ of Restitution, permitting the Sheriff to physically remove the home's occupants from the property. Although Defendants told Ms. Gagnon after entering her home that they were there to serve an eviction, they have not argued that this was the basis for their actions in their briefing or provided any evidence from which the

32

Court could conclude that an unlawful detainer judgment or a Writ of Restitution had been issued, and Ms. Gagnon has stated otherwise. Defendants respond that "[t]he facts of the record support that the bank <u>had possession</u> of the house where the Plaintiff and other people were residing, which is different from an unlawful detainer action as argued by Plaintiffs," Doc. 47, pp. 17–18 (emphasis in original), yet Ms. Gagnon testified that the officers told her they were there to serve an eviction. Viewing this fact in a light most favorable to Ms. Gagnon, if a reasonable officer was aware that he was serving an eviction, he would know that this required a court order, and that without this, the subject remaining in the home retained a reasonable expectation of privacy.[6]

---

[6] For this reason, Defendants' argument that even if the bank did not own the house, the officers did not violate the Fourth Amendment if they acted upon a mistake that is objectively reasonable is inapt. *See McKenney v. Harrison*, 635 F.3d 354, 358 (8th Cir. 2011) (finding "officers do not violate the Fourth Amendment if they act upon a mistake of fact that is objectively reasonable," and that officers' conclusion that a home was abandoned was objectively reasonable where the house was in disrepair, had an unkempt yard and fence that was falling apart, there were no vehicles parked in the driveway, there was no response at the door when the officers knocked, the back door was open three or four inches, the officers could see that the kitchen cabinets and refrigerator were empty and open, there were no furniture or personal effects, and there were no indications that the home had electrical power). Ms. Gagnon's testimony that the officer's informed her that they were there to serve an eviction as well as their police report stating the property "had been taken over by the bank and subjects were still on the property" suggests that they were aware Ms. Gagnon was not a run-of-the-mill trespasser. Furthermore, the law cited by Defendants does not support their implicit position that relying on what the record reflects is a vague phone call from a bank regarding ownership of a home in order to, without taking any steps to verify the report, forcibly enter and search the home without a warrant, consent, or exigency, would be considered an objectively reasonable mistake of fact. *See Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 2801, 111 L. Ed. 2d 148 (1990) (holding that an officer may not violate the Fourth Amendment if he makes an objectively reasonable mistake of fact that the person consenting to entry has authority to grant such consent, but that this holding "does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."); *United States v. Smart*, 393 F.3d 767, 769–70 (8th Cir. 2005) (where officer was unable to see the state on a driver's rear license plate, the officer's stop of the vehicle for failure to display a front license plate in violation of Iowa law was based on sufficient reasonable suspicion, but was not based on a mistake of law or fact). *See also United States v. Washington*, 455 F.3d 824, 828 (8th Cir. 2006) ("Where there is a basis in state law for an officer's action and some ambiguity or state custom that caused the officer to make the mistake, it may be

Defendants' cited caselaw is distinguishable. In *United States v. Peoples*, 854 F.3d 993, 996 (8th Cir. 2017), the Eighth Circuit held that a criminal defendant had no right to privacy in his motel room where the motel clerk gave a key to a police officer so that the defendant could be removed, as the clerk believed the guests were using the motel premises for an unlawful purpose. But the Eighth Circuit's analysis turned on Missouri law permitting a motel to unilaterally eject a person and notify law enforcement for a variety of reasons, including when the "owner or operator reasonably believes that the individual is using the premises for an unlawful purpose." Mo. Rev. Stat. § 315.075. The Eighth Circuit noted that "in Missouri, section 315.075 expressly provides for evictions based on a reasonable belief of illicit activity" and thus "entry into Room 114 was for the lawful purpose of effecting Peoples's eviction," and "the evidence observed during this initial entry was a valid basis for the subsequent search warrant, which Peoples does not otherwise challenge." *Id.* at 997. As discussed above, the process under Missouri law for carrying out an unlawful detainer action and subsequent removal of occupants is more robust than that which is required of a hotel owner to justifiably expel an occupant with the help of law enforcement. There is no evidence here that the bank or the Defendants followed these procedures in order to "*justifiably* expel[]" Ms. Gagnon and her boyfriend here such that her expectation of privacy would become unreasonable. *Id.* at 996 (quoting *Young*, 284 F.3d at 867) (emphasis in original).

In *Cross v. Mokwa*, 547 F.3d 890, 894 (8th Cir. 2008), the Eighth Circuit found that police officers had probable cause to believe that five individuals were illegally occupying a condemned building, properly subjecting them to arrest. The Eighth Circuit overturned the district court's determination that the officers were not entitled to qualified immunity on the claims of unlawful

_____

objectively reasonable. However, in the absence of such evidence, officers cannot act upon misunderstandings of clear statutes or, worse yet, their own notions of what the law ought to be.")

entry, search, and seizure of the property, because the district court improperly considered the officers' subjective expectations and "took too narrow a view of the reasonableness, under the Fourth Amendment, of warrantless entries into condemned buildings." *Id*. at 895. In contrast to the facts here, the Eighth Circuit's analysis clearly turned on the unique nature of a condemned building and the local building code providing that, "[u]pon effecting condemnation of any building, structure or premises by the code official, it shall be unlawful for any person to enter or remain in or on such building, structure or premises . . . *It shall be the duty of the Police to remove any person from such building, structure or premises so condemned . . .*" *Id*. (emphasis in original). The Eighth Circuit reasoned that once a building has been "condemned as unsafe for human occupation, it becomes, at least from the government's perspective, an abandoned structure" and "[p]ublic health and safety require that police officers, as well as building inspectors, have the right to access such structures at any time . . . " *Id*. The facts here are distinguishable, because Ms. Gagnon's home was not condemned, there were no threats to public health and safety, and there was no local ordinance affirmatively imposing a duty on officers to remove individuals in this situation without a court order, as discussed above.

In *United States v. Sawyer*, 929 F.3d 497 (7th Cir. 2019), police officers responded to a report of a residential break-in, and after inspecting the home for signs of forced entry, an individual arrived and told the officers that he owned the home as a rental property and that it was supposed to be empty. *Sawyer*, 929 F.3d at 498. The landlord saw a cracked window and yelled inside for all the occupants to exit immediately, and the officers subsequently banged on the front door and ordered the occupants to exit the home. *Id*. When three individuals exited, the owner asked the officers to "go inside and check my house," and in the basement the officers found a backpack containing guns. *Id*. The Seventh Circuit found that the defendant trespassers did not

have a privacy interest in the home, because their presence was wrongful. The *Sawyer* defendant did "not assert that his—and therefore his backpack's—presence was lawful or offer any basis for his privacy interest in his home." *Id*. at 500. Here, Ms. Gagnon had been living in the home since 2014, and she states that she never received an eviction notice or any other notice that she must vacate the premises. Although the deputies' description of the call from the bank is vague, Defendants do not contend that they were responding to a break-in or that Ms. Gagnon broke into the house in the same manner as in *Sawyer*. Rather, evidence of record indicates that they had at least some understanding of Ms. Gagnon's interest as a resident. *See* Doc. 44-5 (police report stating "Sheriff Wheatley advised that the property had been taken over by the bank and subjects were still on the property. Contact was made with Sarah Gagnon a former resident of the property and advised why we were there."); Doc. 44-2, p. 72 (Ms. Gagnon deposition stating that during the search "[t]hey told me they were there to serve an eviction.") Thus, the privacy interest alleged here is more substantial and objectively reasonable than the defendant in *Sawyer*.

Finally, in *United States v. Ross*, 43 Fed.Appx. 751, 757 (6th Cir. 2002), the Sixth Circuit in an unpublished decision affirmed the district Court's determination that the defendant did not have an objectively reasonable expectation of privacy in his apartment when he had not lived there for two months and had failed to pay rent for four months. *Id*. The landlord had grown concerned that something was wrong, and asked his friend—a Kentucky State Trooper—to go to the tenant's apartment, where the landlord opened the door and the two observed the apartment in disarray with evidence of illegal drug activities. *Id*. at 754. Here, however, Ms. Gagnon had not abandoned the premises, and although they had not paid the bank since May 2017, Ms. Gagnon had spoken to the banker and informed him that she was attempting to secure a loan through another lender in order to be able to pay off the home. Given these distinctions, and the fact that *Ross* is unpublished,

*Ross* does not persuade the Court that Ms. Gagnon had no reasonable expectation of privacy here. *See also United States v. Washington*, 573 F.3d 279, 286 (6th Cir. 2009) (finding that "*Ross* is unpublished and not binding, and we do not adhere to it to the extent it could be read to imply that a tenant's violation of a lease can alone deprive him and his guests of a legitimate expectation of privacy.")

In sum, a reasonable jury could find that Ms. Gagnon exhibited a subjective expectation of privacy. She had lived in the home for almost three years with her children and her boyfriend, who had purchased the property. She stored her belongings there. Although she was aware of the foreclosure, she had informed the bank that she was attempting to procure another loan and she as a resident had never been served any notice that she needed to vacate the home, nor was she aware of any such process being initiated against her boyfriend, the original owner of the home. When the officers arrived at her home, she attempted to and then did regulate access by locking the door until she was ordered to allow the officers in. It was only when they drew their guns and threatened to shoot her dog if Ms. Gagnon did not restrain him that she "felt like [she] had no choice" and unlocked the door after having locked it when her dogs began barking and the officers retreated. Doc. 44-2, p. 30. Viewing all facts in her favor, this is sufficient to demonstrate Ms. Gagnon's subjective expectation of privacy. Further, viewing these facts in her favor, Ms. Gagnon's privacy interest was objectively reasonable. Although she and Mr. Fields were behind on payments and she was aware of a foreclosure, she had paid $3,000 to the bank in May 2017 in order to buy time to secure another loan, and beyond their statement that the bank informed them that it had "possession," Defendants offer no evidence and the record does not reflect that Ms. Gagnon and Mr. Fields had been justifiably expelled under Missouri law. On the record before it, when viewing

37

all facts in Ms. Gagnon's favor, the Court finds that Ms. Gagnon had a reasonable expectation of privacy in her home.

Defendants also argue that their entry and search was permissible, because in light of the bank's phone call, they had probable cause to believe that trespassing had been committed. But even if Defendants had probable cause that a crime was occurring inside the home, probable cause of a crime alone is insufficient to search a home. *See United States v. Wells*, 648 F.3d 671, 678–79 (8th Cir. 2011) ("Not even probable cause, absent an exigent circumstance, would permit an officer to enter that home without a warrant to make an arrest or seize contraband . . . When police officers choose to enter a home, the Fourth Amendment requires that they first obtain consent or a warrant, or, in exigent circumstances, have probable cause.") It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)) (internal quotation marks omitted). *See also United States v. Struckman*, 603 F.3d 731, 746 (9th Cir. 2010) (where officers suspected a criminal trespass, "in the absence of any 'immediate and serious consequences' resulting from the commission of a crime, the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic' militates against warrantless entry." (quoting *McDonald v. United States*, 335 U.S. 451, 460, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Jackson, J., concurring), *Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)); *King v. Massarweh*, 782 F.2d 825, 828 (9th Cir. 1986) (where landlord informed officers that some of plaintiffs did not belong on premises, and the officers arrested the plaintiffs for criminal trespass, searched the apartment, and seized personal items including marijuana, "[t]he arrests for criminal trespass in this case provide weak justification for

the defendant officers' entry into the apartments," and summary judgment for the officers was inappropriate). Of course, the Fourth Amendment warrant requirement is subject to certain exceptions where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment,'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947, 164 L. Ed. 2d 650 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393–394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)), but Defendants have not argued or offered evidence to support any exigencies here,[7] and in their briefing they do not press their previous justifications of obtaining Ms. Gagnon's consent or having secured a warrant. Therefore, the Court cannot say that the officers' warrantless entry in the home without consent, exigency, or other exception to the warrant requirement was objectively reasonable as a matter of law, even assuming they had probable cause to believe a trespass existed.

The Court must also determine whether Ms. Gagnon's Fourth Amendment rights here were clearly established at the time of the incident.

As to her expectation of privacy in her home, the question is whether the facts available to the officers indicated that entry into the home under the circumstances would not be a "clearly established" violation of Ms. Gagnon's rights, because she no longer enjoyed a Fourth Amendment expectation of privacy in the home. As discussed above, caselaw in the Eighth Circuit and elsewhere indicates that whether an individual retained a reasonable expectation of privacy can hinge on whether the person had been justifiably expelled, looking toward state law. *See Molsbarger*, 551 F.3d at 811; *Young*, 284 F.3d at 869; *Rambo*, 789 F.2d at 1295; *Woodward*, 870 F.3d at 1160; *Curlin*, 638 F.3d at 566; *Turpin*, 319 F. Supp. 3d at 199; *Tealer*, 2016 WL 5816915,

---

[7] When asked by the Court at Oral Argument whether there were any exigent circumstances here, Defense counsel acknowledged that he did not believe there was anything in the record that reflected exigent circumstances.

39

at *2; *Jones*, 2011 WL 1770264, at *4; *King*, 693 F. Supp. 2d at 1212; *Gerhart*, 2009 WL 2581715, at *3; *Young*, 573 F.3d at 720; *Ryan*, 188 F.3d at 859. While Ms. Gagnon and Mr. Fields were behind on payments and the home was subject to foreclosure, there is no indication that the Defendant officers here had determined that a judgment of unlawful detainer had been entered against Mr. Fields or Ms. Gagnon, that a Writ of Restitution had issued, and that therefore they could be justifiably expelled by the Sheriff. Although the Defendants here contend that they were under the impression that the bank was in possession of the home and they do not explicitly acknowledge that they were aware that Ms. Gagnon had some interest in the home, when viewing the facts in the light most favorable to Plaintiff the record reflects that they were aware that she had some interest in the property and that the bank was seeking to remove her, which under clearly established Missouri law requires additional legal process. *See* Doc. 44-5 (police report stating "Sheriff Wheatley advised that the property had been taken over by the bank and subjects were still on the property. Contact was made with Sarah Gagnon a former resident of the property and advised why we were there."); Doc. 44-2, p. 72 (Ms. Gagnon deposition stating that during the search "[t]hey told me they were there to serve an eviction.") In asserting the defense of qualified immunity, Defendants have "the burden of establishing the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *McGuire*, 952 F.3d at 922. Defendants have failed to satisfy their burden here. When viewing the facts in the light most favorable to Ms. Gagnon and drawing all reasonable inferences in her favor, the unlawfulness of the actions here would have been apparent to a reasonable officer.

Defendants also seem to assert that the existence of probable cause suggests the right here was not clearly established. Doc. 41, pp. 18–19. However, it is clearly established that even with probable cause that a crime is being committed, the Fourth Amendment requires a warrant, exigent

circumstances, consent, or some other exception to the warrant requirement, none of which Defendants have asserted are applicable here. *See  Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment- subject only to a few specifically established and well-delineated exceptions." (footnote omitted)); *Groh*, 540 U.S. at 559, 124 S.Ct. 1284 (finding that it is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."); *Wells*, 648 F.3d at 678–79 ("Not even probable cause, absent an exigent circumstance, would permit an officer to enter that home without a warrant to make an arrest or seize contraband . . . When police officers choose to enter a home, the Fourth Amendment requires that they first obtain consent or a warrant, or, in exigent circumstances, have probable cause."); *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998) ("It is clearly established that the Fourth Amendment prohibits a warrantless entry into a suspect's home to make a routine felony arrest absent consent or exigent circumstances.")  The Court finds that the contours of this right have been sufficiently established such that Defendants would know that their entry into and search of Ms. Gagnon's home was unlawful.

Therefore, Defendants Cleveland, Morse, Woods, and Wheatley are not entitled to qualified immunity, and their motion for summary judgment on Count III is denied.

> ii.     **COUNT IV: Failure to Train or Supervise pursuant to 42 U.S.C. § 1983 by Plaintiff Gagnon and Plaintiff T.K. against Defendants Wheatley and Moniteau County**

As an initial matter, Plaintiffs "concede that the record does not show any evidence to support a claim that Defendant Moniteau County failed to properly supervise the individual defendants." Doc. 44, p. 13.  However, Plaintiffs maintain that there nonetheless exists a sufficient

basis from which a jury could conclude that Moniteau County and Sheriff Wheatley failed to properly train the individual Defendants.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011). "The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. 51, 61, 131 S. Ct. 1350.

Defendants argue that there is no evidence that Moniteau County was on notice of or deliberately indifferent to any inadequate training, and therefore Plaintiffs' claims must fail. In order to survive summary judgment, Plaintiffs must present evidence that Moniteau County was "on notice that its training procedures were inadequate and likely to result in violation of constitutional rights" by either demonstrating that "the failure to train is so likely to result in a violation of constitutional rights that the need for training is patently obvious" or that "a pattern of misconduct indicates that [Moniteau County's] responses to a regularly recurring situation are insufficient to protect the people's constitutional rights." *Larkin v. St. Louis Hous. Auth. Dev. Corp.*, 355 F.3d 1114, 1117 (8th Cir. 2004) (internal citations and quotations omitted). By either measure, Plaintiffs have failed to present sufficient evidence from which a jury could find Moniteau County or Sheriff Wheatley were on notice that the training procedures were inadequate and likely to result in a violation of constitutional rights.

As to a pattern of misconduct, there is no indication in the record before the Court that Moniteau County or Sheriff Wheatley had notice of a pattern of unconstitutional searches or seizures committed by the individual Defendants, nor is there any evidence that Defendant Cleveland exhibited a pattern of excessive use of force. Rather, Defendants present evidence that Deputy Cleveland has never been terminated from employment, has never been the subject of an investigation aside from the present litigation, and has never had a formal complaint filed against him by an employer. Doc. 41-1, p. A-057. Plaintiffs do not appear to argue otherwise in their briefing.

As to whether Moniteau County or Sheriff Wheatley received notice because "the need for training is patently obvious," Plaintiffs rely entirely on "General Order #3," which was the sole written policy provided to Defendants that governed their conduct during the two incidents at issue. Plaintiffs argue that because this General Order does not contain any provisions describing how to lawfully perform searches or seizures, Defendants necessarily would not have known how to perform the August 7, 2017 and July 24, 2018 searches or seizures that Plaintiffs claim were unlawful. Plaintiffs further assert that although the General Order includes a provision describing use of excessive force, it is "patently inadequate because it does not even suggest to the defendants what the law deems to be excessive or needless force," and therefore Defendant Cleveland "must have thought" he could permissibly arrest Ms. Gagnon with the force that he did "if only because General Order #3 didn't say that he couldn't do that." Doc. 44, pp. 14–15.

However, although Plaintiffs have provided evidence that General Order #3 is the only written policy that the Defendants received during this time period that governed their conduct, they have neither alleged nor offered evidence from which the Court could conclude that this was the only training the officers received. Rather, Defendants offered evidence that Defendants

43

Wheatley, Cleveland, Woods, and Morse have each had training in law enforcement topics, including those at issue here. *See* Doc. 47-1, pp. A-67–A-81. Sheriff Wheatley has obtained his Class A law enforcement license and attended more than 125 related courses. *Id.* Deputy Cleveland has also obtained his Class A law enforcement license and attended over forty law enforcement classes. *Id.* Deputy Morse has earned his Missouri Class A POST License, which has included 640 hours in coursework as well as continuing education hours. *Id.* Defendant Woods has served as an officer in other police departments and Sheriff's Offices, as well as on the Mid-Missouri Drug Task Force over the last ten years and has also received training in law enforcement topics in the last five years. *Id.* Plaintiffs do not address this training or offer evidence to counter its efficacy. *See Tucker v. Evans*, 276 F.3d 999, 1003 (8th Cir. 2002) (finding "several cases in this circuit have held that attendance at a training academy and on-the-job training is sufficient for proper training;" thus the two officers received adequate training where the officer completed a six-week course and received on-the-job training); *Williams–El v. Johnson*, 872 F.2d 224, 230 (8th Cir. 1989) (finding police academy and on-the-job training adequate for correctional officers with no prior experience).

The Eighth Circuit's decision in *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201 (8th Cir. 2013) is instructive. In *Atkinson*, the plaintiff had alleged that "the absence of a binding, written policy on the use of force demonstrated deliberate indifference on the part of the City." *Atkinson*, 709 F.3d at 1216. The Eighth Circuit found this to be "patently insufficient" because "a municipality may not be held liable under § 1983 merely because it 'failed to implement a policy that would have prevented an unconstitutional act by an employee otherwise left to his own discretion.'" *Id.* (quoting *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 395 (8th Cir. 2007)). In addition, the plaintiff had failed to submit evidence of any other excessive force

incident. *Id*. Therefore, "because no reasonable jury could find the city had notice that its lack of written use-of-force policies was likely to result in a constitutional violation, the city's failure to adopt such policies does not create a genuine dispute of material fact" and summary judgment was warranted. *Id*. at 1216–17.

Similarly here, Plaintiffs simply assert that the insufficiency of General Order #3 demonstrates that Moniteau County was deliberately indifferent to Plaintiffs' rights with respect to its training, but they do not address the other training that Defendants have received, nor do they provide examples of other similar incidents. Beyond this assertion, Plaintiffs cite no further evidence or supporting authority from which the Court could determine that Moniteau County or Sheriff Wheatley were on notice that the training policies were inadequate, and "[n]otice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Id*. at 1216. Nothing in the record would enable Plaintiffs to meet "the rigorous, deliberate indifference standard of fault." *Szabla*, 486 F.3d at 395. Therefore a reasonable juror could not find, from the evidence Plaintiffs have provided, that a violation of constitutional rights would inevitably occur in Moniteau County as a result of Moniteau County's training policies. Defendants' Motion for Summary Judgment on Count IV is granted.

### c. State Law Claims

Plaintiffs assert Missouri law claims of battery, false imprisonment, intentional infliction of emotional distress, libel, and malicious prosecution against Defendants. In addition to other arguments, Defendants move for summary judgment on the grounds of official immunity.

"'The official immunity doctrine provides that public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions.'" *Seiner v. Drenon*, 304 F.3d 810, 813 (8th Cir. 2002) (quoting *DaVee v. Mathis*, 812 S.W.2d 816,

827 (Mo. Ct. App. 1991)). "Discretionary acts require 'the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether an act should be done or a course pursued.'" *Warren v. State*, 939 S.W.2d 950, 953 (Mo. Ct. App. 1997) (quoting *Rustici v. Wiedemeyer*, 673 S.W.2d 762, 769 (Mo. banc 1984)). An officer's "decision to arrest someone" and "decision to use force in the performance of his duties" both are discretionary acts. *Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017) (quotation marks and citations omitted). Official immunity applies to intentional as well as negligent acts. *Seiner v. Drenon*, 304 F.3d 810, 813 (8th Cir. 2002) (applying official immunity to a case involving state law claims of battery, assault, and excessive force); *DaVee v. Mathis*, 812 S.W.2d 816, 827 (Mo. Ct. App. 1991) (officers were entitled to official immunity on plaintiff's assault claim); *Richardson v. Sherwood*, 337 S.W.3d 58, 63 (Mo.Ct.App.2011) (noting cases applying official immunity to intentional tort claims of false imprisonment, assault and malicious prosecution).

However, official immunity does not apply to discretionary acts "done in bad faith or with malice." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986). An officer acts with malice or bad faith "when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* at 447. "'Bad faith' means 'conscious wrongdoing' or 'breach of a known duty through some ulterior motive.'" *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (quoting *State ex rel. Twiehaus*, 706 S.W.2d at 446).

Plaintiffs argue the merits of the state law claims as described below, but the only argument they offer in response to Defendants' assertion of official immunity is that "Defendant Cleveland's claim to official immunity under these counts for battery, false imprisonment, and infliction of emotional distress is founded on his claim that he conducted a valid traffic stop. But as Plaintiffs

argued *ante*, he did not." Doc. 44, p. 22. The Court has determined that the traffic stop of T.K. was valid under the Fourth Amendment. However, even if it was not, this does not bar application of official immunity under Missouri law. *See State ex rel. Twiehaus*, 706 S.W.2d at 446 (explaining "[a]lthough it is stated a variety of ways, it is generally held that official immunity applies to all discretionary acts except those done in bad faith"). Although Plaintiffs assert that during the July 2018 incident Deputy Cleveland had no lawful reason to stop T.K. and that "[i]nstead, he encountered Plaintiffs only for the purposes of harassing and injuring them," they provide no support for that position. *See Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017) (noting that bad-faith allegation cannot survive summary judgment if court cannot reasonably infer bad faith from the facts); *Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 585 (8th Cir. 2006) (officers entitled to official immunity for acts during investigation of a crime where "[p]utting aside her numerous unsupported contentions, we conclude [Plaintiff] presents no specific evidence of bad faith on the part of any of the officers."); *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986) ("Bad faith . . . embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.")

The Court discusses each state law claim in turn below.

### i. COUNT V: Battery – Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018

Plaintiffs contend that Deputy Cleveland is liable for battery arising from his taking T.K.'s arm and leading him to the patrol vehicle as well as his physical contact with Ms. Gagnon in detaining her.

47

Under Missouri law, a police officer "is not liable for injuries inflicted by him in the use of reasonably necessary force to preserve the peace and maintain order, or to overcome resistance to his authority." *State ex rel. & to Use of Donelon v. Deuser*, 345 Mo. 628, 635, 134 S.W.2d 132, 135 (1939). An officer may accomplish an arrest "by the use of force co-extensive with his duty" to "bring the arrestee under physical restraint." *State v. Nunes*, 546 S.W.2d 759, 763 (Mo. Ct. App. 1977). "[A] police officer's decision to use force in the performance of his duties is discretionary rather than ministerial." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (citing *Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006); *Conway v. St. Louis Cnty.*, 254 S.W.3d 159, 165 (Mo.App.2008); *Seiner v. Drenon*, 304 F.3d 810, 813 (8th Cir. 2002)).

As previously discussed, a reasonable jury could find that Deputy Cleveland's use of force in detaining Ms. Gagnon's exceeded what was necessary under the circumstances. However, Deputy Cleveland is entitled to official immunity under state law. Although both Plaintiffs have testified to Deputy Cleveland's argumentative demeanor during the stop, they have failed to introduce evidence indicating that Deputy Cleveland intended to injure Ms. Gagnon or was engaging in conscious wrongdoing so as to rise to the level of bad faith or malice. Similarly, there is no evidence to suggest that in taking T.K. by the arm and leading him to the patrol vehicle, Deputy Cleveland acted with an intent to injure or ill will toward T.K. Therefore, Deputy Cleveland is entitled to official immunity on Plaintiffs' battery claims.

### ii. COUNT VI: False Imprisonment – Plaintiff Gagnon and Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018

Under Missouri law, "false imprisonment occurs when there is confinement without legal justification." *Walker v. Hanke*, 992 S.W.2d 925, 934 (Mo. Ct. App. 1999). A plaintiff must show that there was a restraint against his or her will and the unlawfulness of the restraint. *Id*.

48

Similar to their 42 U.S.C. § 1983 claim for unlawful seizure in Count I, Plaintiffs argue that Deputy Cleveland falsely imprisoned them on July 24, 2018, because Deputy Cleveland had no legitimate reason to stop T.K., and without a valid traffic stop, there was no traffic stop for Ms. Gagnon to interfere with so as to provide a basis to restrain her.

Defendants assert that Deputy Cleveland is entitled to official immunity, because he restrained T.K. in the course of a traffic stop with minimal force, and because he detained Ms. Gagnon when she did not comply with instructions. "Deciding whether or not to arrest someone is a matter of discretion—the officer must decide what course should be pursued based on the circumstances at hand." *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005). The same exercise of reason and discretion is required by the decision of whether to perform a traffic stop and detain an individual. *See Wilkinson v. Barrett*, No. 11-4251-CV-C-NKL, 2013 WL 12140311, at *7 (W.D. Mo. Jan. 23, 2013) ("An officer's decision about whether to conduct an arrest or a traffic stop is discretionary.") Plaintiffs do not argue otherwise. Accordingly, Deputy Cleveland has official immunity for his detainment of T.K. and detainment and subsequent arrest of Ms. Gagnon unless he acted in bad faith or with malice. *See State ex rel. Twiehaus*, 706 S.W.2d at 446. As discussed above with respect to Plaintiffs' battery claim, they have failed to introduce sufficient evidence from which a jury could find Deputy Cleveland acted with the requisite degree of bad faith or malice in detaining and arresting T.K. or Ms. Gagnon. Therefore, Deputy Cleveland is entitled to official immunity on Count VI, and summary judgment on this claim is granted in his favor.

### iii.  COUNT VII: Intentional Infliction of Emotional Distress – Plaintiff T.K. against Defendant Cleveland for the events of July 24, 2018

Under Missouri law, a claim of intentional infliction of emotional distress requires: "(1) the defendant must act intentionally or recklessly; (2) the defendant's conduct must be extreme and

49

outrageous; and (3) the conduct must be the cause (4) of severe emotional distress." *Hyatt v. Trans World Airlines, Inc.*, 943 S.W.2d 292, 297 (Mo. Ct. App. 1997).

Defendants argue that T.K.'s claim must fail because he has failed to show the requisite degree of severe emotional distress. "To prove a claim for intentional infliction of emotional distress where no physical injury has occurred, it is necessary to show 'emotional distress or mental injury' which 'must be medically diagnosable and must be of sufficient severity so as to be medically significant.'" *Childs v. Williams*, 825 S.W.2d 4, 10 (Mo. Ct. App. 1992) (quoting *Bass v. Nooney Co.*, 646 S.W.2d 765, 772–73 (Mo. banc 1982)).

After the incident, T.K. visited a therapist between ten and fifteen times, with appointments once every week to two weeks. Doc. 44-4, pp. 21–22. He also experienced difficulty sleeping, *Id.*, and his doctor told Ms. Gagnon that she could give him melatonin, but she declined due to concerns about medicating him, and he has not been to see a doctor regarding the sleep difficulties. Doc. 44-2, pp. 65–66.

Although when viewing the facts in the light most favorable to T.K. he did experience some emotional distress evidenced by his therapy sessions and difficulty sleeping for a period, the Court cannot say that a reasonable jury could find that these facts demonstrate severe emotional distress. The facts here are distinguishable from *Jarrett v. Jones*, 258 S.W.3d 442, 449 (Mo. 2008), which Plaintiffs cite to support their claim that T.K.'s emotional distress here rises to a sufficient level of severity. In *Jarrett*, the Supreme Court of Missouri found that the trial court had erred in granting the Defendant's motion for summary judgment on a claim of negligent infliction of emotional distress, which similarly requires that the "emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant." *Jarrett*, 258 S.W.3d at 448. In *Jarrett*, the parties had been in a vehicle collision that resulted in the death

of the Defendant's two-year-old daughter. The Plaintiff alleged that the Defendant negligently caused the crash, and that the Plaintiff suffered severe emotional distress after viewing the daughter's body. The Plaintiff testified that after the accident he, "'couldn't focus on anything,' 'wanted to die,' 'didn't want anything to do with anybody,' and kept going over in his mind what he could have done to avoid killing [the child]." *Id*. at 449. He was "unable to drive a vehicle for weeks after the accident," "unable to work as a truck driver for four months," was prescribed anti-anxiety and prescription sleep medications by his family physician to deal with his side effects, received months of counseling and therapy, and was treated by two licensed social workers, both of whom diagnosed him with post-traumatic stress disorder. *Id*. An affidavit from one of the social workers stated that the plaintiff "suffered from severe, acute post-traumatic stress disorder as a direct and proximate result of being personally involved in a collision that resulted in the death of a child." *Id*. at 449. Here, T.K. has not testified that he experienced any degree of emotional distress and Plaintiffs do not present any medical evidence describing the diagnosis or impact of his emotional distress. Although a doctor told Ms. Gagnon that she could give T.K. melatonin for his sleeping difficulties, T.K. never ended up taking any melatonin and there is no evidence that he was prescribed anti-anxiety or sleep medications to the degree seen in *Jarrett*. *See also Rooney v. Nat'l Super Markets, Inc.*, 668 S.W.2d 649, 651 (Mo. Ct. App. 1984) (where plaintiff alleged that she suffered severe mental pain, anguish, embarrassment, shock, fright, humiliation, distress, lost sleep, inability to concentration on television, stomach pain, and two months of unemployment, this did not rise to the level of "distress so severe that no reasonable man could be expected to endure it," because "granting that plaintiff suffered and may still suffer from emotional distress, it is not to the degree that an action for outrageous conduct will lie.")

Therefore, even viewing the facts and drawing all inferences in a light most favorable to Plaintiffs, no reasonable jury could find that T.K. suffered sufficiently severe emotional distress as a result of this incident, and therefore Deputy Cleveland's motion for summary judgment on this claim is granted.

### iv. COUNT VIII: Libel – Plaintiff Gagnon against Defendant Wheatley for the events of August 7, 2017

Ms. Gagnon alleges that on or about August 7, 2017, Sheriff Wheatley published defamatory "written statements on 'Facebook' and to other electronic media outlets that he and the other defendants had found methamphetamine in Plaintiff Gagnon's residence when all of them knew that they had not found anything implicating Plaintiff Gagnon." Doc. 1, pp. 18–19.

Under Missouri law, a plaintiff pursuing a defamation claim must show "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Smith v. Humane Soc'y of United States*, 519 S.W.3d 789, 798 (Mo. 2017). A plaintiff must show actual damages. *Taylor v. Chapman*, 927 S.W.2d 542, 544 (Mo. Ct. App. 1996) (citing *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 308 (Mo. banc 1993)).

Defendants argue that the press release describing Ms. Gagnon's drug arrest that Ms. Gagnon asserts was defamatory cannot support her claim because she has failed to show actual damages. In her Suggestions in Opposition, Ms. Gagnon "concedes that the record does not show that she suffered adverse consequences of Defendant Wheatley's conduct of publicizing her arrest of August 7, 2017." Doc. 44, p. 24. Therefore, Sheriff Wheatley's Motion for Summary Judgment on Count VIII is granted.

52

### v. COUNT IX: Malicious Prosecution – Plaintiff Gagnon against Defendants Wheatley, Cleveland, Morse, and Woods for the events of August 7, 2017

A claim for malicious prosecution in Missouri requires proof of "(1) the commencement of a prosecution against the plaintiff; (2) instigation by the defendant; (3) termination of the proceeding in favor of the plaintiff; (4) the want of probable cause for the prosecution; (5) [that] the defendant's conduct was actuated by malice [;] and (6) that the plaintiff was damaged." *Cassady v. Dillard Dept. Stores*, 167 F.3d 1215, 1219 (8th Cir. 1999) (quoting *Bramon v. U–Haul, Inc.*, 945 S.W.2d 676, 684 (Mo. Ct. App. 1997)). "Malicious prosecution actions are not favored in the law as public policy supports uncovering and prosecuting crime. As such, courts require strict compliance with the requisite elements." *Copeland v. Wicks*, 468 S.W.3d 886, 889 (Mo. 2015) (en banc) (citation omitted). Ms. Gagnon's claim is based on the commencement of the prosecution for possession of marijuana. Doc. 1, p. 21. Defendants assert that they are entitled to summary judgment on Count IX because probable cause existed for the prosecution of Ms. Gagnon and official immunity applies.

Despite the potentially unlawful nature of the search that led to discovery of the marijuana pipe and the subsequent inconsistencies in justifying that search, once Sheriff Wheatley saw the marijuana pipe, he had probable cause for the subsequent prosecution for possession of that pipe. Furthermore, Plaintiffs do not argue and the Court cannot say that the commencement of the prosecution of Ms. Gagnon for possession was done with legal malice toward Ms. Gagnon or an intent to cause injury. *See Stockley v. Joyce*, No. 19-1573, 2020 WL 3493522, at *7 (8th Cir. June 29, 2020) (quoting *Sanders v. Daniel Int'l Corp.*, 682 S.W.2d 803, 814 & n.4 (Mo. 1984) (en banc)) ("Missouri law requires that the plaintiff allege facts that show that 'the proceedings must have been initiated primarily for a purpose other than that of bringing an offender to justice' and that the government 'acted without reasonable grounds.'"); *Blue*, 170 S.W.3d at 479 ("Bad faith

or malice generally requires actual intent to cause injury.") Therefore, Defendants Wheatley, Cleveland, Morse, and Woods are entitled to official immunity on the malicious prosecution claim, and summary judgment is granted in their favor.

## V.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment on Counts II and III as to Defendants Cleveland, Morse, Woods, and Wheatley in their personal capacities is denied.  Defendants' Motion for Summary Judgment on all other counts and against the Defendants in their official capacities is granted.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 10, 2020
Jefferson City, Missouri